IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| Plaintiff, | : | |
| v. | : | Case No. 2:17-cr-200 |
| ADAM EASLEY, | : | JUDGE ALGENON L. MARBLEY |
| Defendant. | : | |

## ORDER ON MOTION TO SUPPRESS

In March 1968, shortly before *Terry v. Ohio* was published, Justice Brennan wrote the following words to Chief Justice Warren:

> *I've become acutely concerned that the mere fact of our affirmance in* Terry *will be taken by the police all over the country as our license to them to carry on, indeed widely expand, present "aggressive surveillance" techniques which the press tells are being deliberately employed in Miami, Chicago, Detroit and other ghetto cities. . . . This seems to me particularly unfortunate since our affirmance surely does this: from here on out, it becomes entirely unnecessary for the police to establish "probable cause to arrest" to support weapons charges; an officer can move against anyone he suspects has a weapon and get a conviction if he "frisks" him and finds one. In this lies the terrible risk that police will conjure up "suspicious circumstances" and courts will credit their versions.*[1]

This is a case about that terrible risk. The matter is before the Court on Defendant Adam Easley's Motion to Suppress. (ECF No. 28) The Court held a Hearing on the Motion to Suppress

---

[1] Letter from Justice William J. Brennan, Jr. to Chief Justice Earl Warren 2 (Mar. 14, 1968) (available in William J. Brennan, Jr. Papers, cont. 171, Manuscript Division, Library of Congress) (containing Brennan's blue pencil corrections) (cited in Paul Butler, *The White Fourth Amendment*, 43 TEX. TECH L. REV. 245, 248 (2010)).

on Monday, April 2, 2018, at 9:30 a.m. (ECF No. 29). After review of the briefs and consideration of oral argument of the parties, the Court **GRANTS** the Motion to Suppress.

### I. BACKGROUND

#### A. Factual Background

At approximately midnight on Wednesday, June 7, 2017, Officer Clayton Adams of the City of Whitehall Police Department was in his patrol vehicle traveling southbound on Hamilton Road. (Hr'g Trans.) He spotted two men later identified as Defendant Adam Easley and non-party Anthony B. Sawyer standing alone in a parking lot, about twenty or thirty feet away from the road. (*Id.*). As Officer Adams repeatedly conveyed to this Court, at the moment he observed the two men, he had not seen them engaged in any illegal activity: "[t]hey were just standing there" and Officer Adams "just believed it was suspicious that they were there." (*Id.*). He called dispatch and reported a 48A—the police code for "suspicious person"—and noted that he would be "out of his vehicle talking to two suspicious males." (*Id.*; *accord* CITY OF COLUMBUS DIVISION OF POLICE RADIO CODE, https://www.columbus.gov/uploadedFiles/Columbus/Departments/Public_Safety/Division_of_Police/Police/About_Us/Official%20Ten%20Codes.pdf (last visited April 11, 2018)). Officer Adams then made a U-Turn on Hamilton Road and pulled into the parking lot to investigate.

At this juncture, the Court is compelled to note a salient truth: Mr. Easley and Mr. Sawyer are both black. (*See* Gov't Exh. 2).

As the Officer drove up in his patrol car, he observed two cans of Four Loko[2] on the ground near Mr. Easley and Mr. Sawyer. (ECF No. 28-1). Officer Adams testified that one of the cans appeared to be open because the can tab was pointed upward. (*Id.*). At no point did

---

[2] Four Loko is an alcoholic malt beverage. *See* FOUR LOKO FAQs, http://fourloko.com/faq (last visited March 30, 2018).

2

Officer Adams observe either of the men holding the cans. (*Id.*). Nor did he ask Mr. Easley or Mr. Sawyer if the cans belonged to them. (*Id.*).

He then asked the men for their identification. (*Id.*). Mr. Easley and Mr. Sawyer immediately complied. (*Id.*; Gov. Exh. 2).

Less than one minute after Officer Adams first approached the men, Officer Gary Baker, also of the City of Whitehall Police Department, arrived on the scene. (Gov. Exh. 2). Officer Baker was able to arrive so quickly because he had been patrolling the same neighborhood as Officer Adams—in fact, he had spotted Mr. Easley and Mr. Sawyer in the parking lot even before Officer Adams had. When Officer Baker first spotted the men, he—like Officer Adams— had no suspicion that the men were engaged in any illegal activity. (Hr'g Trans.). Unlike Officer Adams, however, that dearth of articulable suspicion led Officer Baker to conclude there was no need to detain and interrogate the men. (*Id.* ("The Court: [. . . Y]ou saw them but you didn't see them doing anything; is that right? The Witness: That's right. The Court: So you continued with your surveillance of the general neighborhood with intentions to come back to confirm that they still weren't doing anything inappropriate? The Witness: That's right.")). Officer Baker therefore decided to continue his patrol through the neighborhood. (*Id.*). That plan changed when he heard Officer Adams' call to police dispatch reporting two "suspicious males." (*Id.*). Officer Baker then decided to join Officer Adams in the parking lot. (*Id.*).

Officer Adams later wrote a report describing the Officers' interaction with Mr. Easley and Mr. Sawyer. In that report, he recounted the following series of events:

> I approached them and asked for identification. Easley had an outstanding warrant issued by our agency. He was handcuffed and searched. During the search, Officer Baker recovered a pistol that was concealed inside Easley's waistband. A CCH was conducted that showed Easley has numerous convictions for felony drug activity and felony offenses of violence.

3

(ECF No. 28-1).

Testimony and evidence entered at the suppression hearing both substantially complicated and, in key ways, contradicted Officer Adams' written narrative. Video from the dash camera showed that immediately after Officer Baker arrived on the scene, Officer Baker asked Officer Adams whether he first ran Mr. Easley or Mr. Sawyer's information to detect any outstanding warrants. (Gov. Exh. 2). Officer Adams stated that he was unsure whose information he ran. (*Id.*). In this state of uncertainty, before collecting any additional information about the existence of a warrant, Officer Baker placed Mr. Easley in handcuffs, moved him out of view of the camera, and patted him down. (Gov. Exh. 2).

That search revealed nothing. (*Id.*). But Mr. Easley still was not released. (*Id.*).

Officer Baker moved Mr. Easley over to his police cruiser, then conducted a second, more thorough search of Mr. Easley. (*Id.*). That search revealed the Taurus .38 caliber revolver that formed the basis of the crime of which Mr. Easley now stands accused: felony possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Officer Baker conceded that, contrary to Officer Adams' written narrative, the first search of Mr. Easley occurred before they received any information as to Mr. Easley's warrant. (Hr'g Trans.). As for whether the second search was also a warrantless search, the record is unclear. Officer Adams never clearly identified the point at which law enforcement learned there was a warrant for Mr. Easley's arrest. (Hr'g Trans.). Officer Baker testified that when he performed the second search of Mr. Easley, he was aware of the warrant. (Hr'g Trans.). The footage from the dash camera, however, suggests that at the time of the second search, the Officers were aware that there was a warrant as to one of the two men, but that there remained some ambiguity as to which of the two. (Gov't Exh. 2).

4

The underlying warrant for Mr. Easley's arrest was for failure to appear in the City of Whitehall Mayor's Court in lieu of paying a $50 fine for an underlying noise violation. (Hr'g Trans.). At no point prior to the discovery of the gun did any of the Officers have any information that would lead them to conclude that Mr. Easley was potentially dangerous.

### B. Procedural History

Mr. Easley now submits that law enforcement officers unlawfully seized his person and property, that there was no basis for the search or his arrest, and that, as a result, both were unlawful and in violation of his constitutional rights. (ECF No. 28 at 3). He filed the pending motion to suppress the firearm and Mr. Easley's post-arrest statements on March 5, 2018. (ECF No. 28).

## II. LAW AND ANALYSIS

### A. Applicable Law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. AMEND. IV. This protection extends even to temporary detentions commenced for a limited purpose, such as the "brief investigatory stops described by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 273, 122 (2002)).

As a threshold matter, it is arguable that, at some point prior to the confirmation of Mr. Easley's outstanding warrant, the seizure of Mr. Easley transformed from a "narrowly defined intrusion[]" contemplated by *Terry* to a de facto arrest that required not just reasonable articulable suspicion but instead either consent or probable cause. *Dunaway v. New York*, 442 U.S. 200, 213 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 882 (1975). The line

5

between an arrest and a *Terry* stop is "often unclear." *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 591 (6th Cir. 1994). But the record contains some powerful indicia that Mr. Easley was arrested, to wit: Officer Adams repeatedly testified that Mr. Easley was arrested *before* he was searched. (Hr'g Trans. ("Q: So he's arrested and then he's searched, correct? A: Yes, ma'am."); ("Q: I'm sorry. He was arrested, yes? And then he was searched? A: Yes.")). He also noted that from the inception of the encounter, neither Mr. Easley nor Mr. Sawyer was free to leave. (*Id.* ("Q: So essentially you're accusing them of open container, right? A: That's correct. Q: They weren't free to leave at that point? A: No, ma'am.")). Moreover, the police retained physical possession of Mr. Easley's identification card, and both Mr. Easley and his compatriot were handcuffed and physically restrained. These factors alone would likely lead the average person to feel that he or she was not free to leave a police encounter. *See United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011) ("A reasonable person in [the Defendant's] position would not have felt free to leave when, after walking away from the police two times, an officer targeted Beauchamp by driving up to him, instructed him to stop, and then instructed him to turn around and walk toward the officer."); *Smoak v. Hall*, 460 F.3d 768, 781 (6th Cir. 2006) ("Although the use of guns, handcuffs, and detention in a police cruiser do not automatically transform a *Terry* stop into an arrest, these displays of force must be warranted by the circumstances.") (citing *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999).

The case that Mr. Easley was unlawfully arrested becomes even more potent when race is taken into consideration. In *Mendenhall*, the Supreme Court recognized that when a white officer approaches a black civilian, racial dynamics might make the civilian feel "unusually threatened" by the police and that race should therefore be relevant in determining whether a

reasonable person would feel free to leave a police encounter. *United States v. Mendenhall*, 446 U.S. 544, 558 (1980). Consider the analysis of Professor Devon Carbado, who observed that "a black man, over the course of his lifetime, is likely to have several encounters with the police. During these encounters, the police may ask him to produce identification, to justify his presence at a particular location, [and] to explain where he is traveling to and from . . . ." Devon W. Carbado, *(e)racing the Fourth Amendment*, 100 MICH. L. REV. 946, 977 (2002). That is, of course, precisely what happened to Mr. Easley. As a result, even "[t]he absence of overtly coercive police tactics" in Mr. Easley's detention "should not end the seizure analysis" and should not itself resolve the question of whether Mr. Easley was unlawfully arrested. *Id.* at 984.

With all this said, the remainder of the Court's analysis focuses not on whether the *Terry* stop transformed into an arrest, but instead on whether the search performed on Mr. Easley fails even the laxer standard afforded to law enforcement under *Terry*. Because the Court ultimately concludes that the Whitehall Police Department lacked even reasonable suspicion when it searched Mr. Easley, it need not further consider the precise temporal moment at which Mr. Easley's detention became a de facto arrest.

An officer may stop a person under *Terry* only if he "has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). "A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *United States v. Baldwin*, 114 F. App'x 675, 679 (6th Cir.2004) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). More than just

7

an officer's "inchoate and unparticularized suspicion or 'hunch'" is required. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citing *Terry*, 392 U.S. at 30)).

If the search was unlawful, evidence obtained from the illegal search must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). In order to defeat a motion to suppress evidence obtained during a warrantless search, the Government must show by a preponderance of the evidence that when the seizure occurred it was supported by reasonable suspicion. *See United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974).

If the government meets that burden, the Court next must consider "whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the [officers'] conduct given their suspicions and the surrounding circumstances." *United States v. Davis*, 514 F.3d 596, 608 (6th Cir. 2008) (citing *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). The detention must be "sufficiently limited in time" and the investigative means used "the least intrusive means reasonably available." *Id.*

### B.     Application to the Search and Seizure of Mr. Easley

#### 1.  Police Officers Lacked Reasonable Articulable Suspicion to Search Mr. Easley

The Constitution requires that "reasonable suspicion to stop a person, whether suspected of a past or ongoing crime, must rest on specific facts—available to the officers *before* they initiate contact." *United States v. Hudson*, 405 F.3d 425, 438 (6th Cir. 2005). A search that is not "justified at its inception" is a search that is abhorrent to the Constitution. *Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 394 (6th Cir. 2001) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

8

The original sin of this investigation was that two citizens were stopped based not on specific facts available to police before contact was initiated, but instead based purely on an individual law enforcement officer's determination that two citizens looked suspicious. Officer Adams conveyed in no uncertain terms that he commenced the investigation on this improper basis: he conceded that the moment he decided to pull into the parking lot, the men were "just standing there." (Hr'g Trans.) They were not loud, they were not destructive, they were not near any buildings or cars—as far as he knew, and for that matter, as far as this Court knows now, they were not even drinking in public. (*Id.*). His call to dispatch confirmed that he did not pull into the parking lot because he suspected the two men to be engaged in criminal *activity*—instead, he pulled into the parking lot because he believed the men to be suspicious *people*. (*Id.*). That Officer Adams' decision to pull into the lot was based on suspicion of the men themselves and not on any behavior the men exhibited is corroborated by Officer Baker's testimony. Officer Baker had nearly contemporaneously observed Mr. Easley and Mr. Sawyer in the same parking lot, but he concluded that he had no basis to stop them because he observed no illegal or suspicious activity. (*Id.*).

In sum, the testimony of Officer Adams and Officer Baker makes plain that there was absolutely no "individualized suspicion of wrongdoing," as the Fourth Amendment generally requires. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). The touchstone of *Terry* and its progeny has always been suspicious *behavior*. *Terry v. Ohio*, 392 U.S. 1, 6 (1968) (noting defendant's "elaborately casual and oft-repeated reconnaissance" of a store window and the officer's resulting suspicion that defendants were "casing a job"); *see also, e.g. Navarette v. California*, 134 S. Ct. 1683, 1690 (2014) (providing that "even a reliable tip will justify an

9

investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot'" and proceeding to analyze whether a 911 call reporting a car that ran another vehicle off the roadway justified a stop on the basis of suspicion of *ongoing* intoxicated driving (quoting *Terry*, 392 U.S. at 30)); *United States v. Pearce*, 531 F.3d 374, 382 (6th Cir. 2008) (holding that a police officer had reasonable articulable suspicion for a *Terry* stop after a suspect exited a car, glanced towards the officer, hunched over, placed his right hand in the small of his back, and backed away). Here, there was only suspicion of *an individual*. The Constitution simply does not brook this type of policing: "The suspicionless search is the very evil the Fourth Amendment was intended to stamp out." *Samson v. California*, 547 U.S. 843, 858 (2006) (Stevens, J., dissenting) (citing *Boyd v. United States*, 116 U.S. 616, 625–630 (1886)); *see also Boyd v. United States*, 116 U.S. 616, 630 (1886) ("It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense. . ."). As Justice Stevens explained in his dissent in *Samson*, "[t]he pre-Revolutionary 'writs of assistance,' which permitted roving searches for contraband, were reviled precisely because they 'placed the liberty of every man in the hands of every petty officer.'" *Id.* (quoting *Boyd*, 116 U.S. at 625). The Fourth Amendment was intended to be a bulwark against such arbitrariness—arbitrariness that is inconsistent both with liberty and with the rule of law. *See United States v. Jeffers*, 342 U.S. 48, 51 (1951) ("Over and again this Court has emphasized that the mandate of the Amendment requires adherence to judicial processes. . . . In so doing the Amendment does not place an unduly oppressive weight on law enforcement officers but merely interposes an orderly procedure under the aegis of judicial impartiality that is necessary to attain the beneficent purposes intended.").

Moreover, Americans have the right to wander, to stroll, and even, if they wish, to loaf about without purpose or object. Such activities are "historically part of the amenities of life as we have known them. They are not mentioned in the Constitution or in the Bill of Rights. These unwritten amenities have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity. These amenities have dignified the right of dissent and have honored the right to be nonconformists and the right to defy submissiveness. They have encouraged lives of high spirits rather than hushed, suffocating silence." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164 (1972). In *Papachristou*, the Supreme Court held that a Florida vagrancy ordinance was void for vagueness precisely because it trampled on those amenities of life and "encourage[d] arbitrary and erratic arrests and convictions." *Id.* at 162 (citing *Thornhill v. Alabama*, 310 U.S. 88 (1940); *Herndon v. Lowry*, 301 U.S. 242 (1937)). Here, the stop was initiated not through selective enforcement of a statute but instead on a police officer's subjective assessment of an individual's personal traits—an even more troublingly nebulous basis upon which to commence police action. Officer Adams observed two men not doing *anything* and concluded that they were "suspicious": it was, in short, the quintessence of arbitrariness.

Such arbitrariness is insidious for at least one more reason: it invites the evil of capricious enforcement based on the immutable characteristics of the surveilled. *See, e.g.*, JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 97 (1980) ("[T]he Fourth Amendment can be seen as another harbinger of the Equal Protection Clause, concerned with avoiding indefensible inequities of treatment."). To permit law enforcement officers to detain and search individuals based on their own views of what "types" of individuals appear, to them, to be "suspicious" would inevitably and inexorably exacerbate overpolicing of the

11

underprivileged and of communities of color. *See* PRESIDENT'S COMMITTEE ON CIVIL RIGHTS, REPORT: TO SECURE THESE RIGHTS 25 (1947) ("Where lawless police forces exist, their activities may impair the civil rights of any citizen. In one place the brunt of illegal police activity may fall on suspected vagrants, in another on union organizers, and in another on unpopular racial and religious minorities, such as Negroes, Mexicans, or Jehovah's Witnesses. But wherever unfettered police lawlessness exists, civil rights may be vulnerable to the prejudices of the region or of dominant local groups, and to the caprice of individual policemen. Unpopular, weak, or defenseless groups are most apt to suffer."). And, as the Sixth Circuit recently observed: "[t]he protections of the Fourth Amendment are not so weak as to give officers the power to overpolice people of color under a broad definition of suspicious behavior." *United States v. Warfield*, No. 17-3930, slip op. at 9 (6th Cir. Apr. 13, 2018).

Contrary to the arguments of the Government, this initial defect was not cured once Officer Adams discovered the cans of Four Loko. Although it is true that possession of open containers of alcohol in public is a violation of Ohio law, OHIO REV. CODE § 4301.62, the government has not marshaled any evidence to convince this Court that police had a particularized and objective basis for suspecting that Mr. Easley was, himself, in violation of that law. Although Officer Adams testified that he believed one of the containers was "open," he never saw either of the men drinking from the containers and made no attempt to ask the men whether the containers belonged to them. Without more, all Officer Adams had was an inchoate hunch. This error—already fatal to the Government's case—was compounded by the fact nothing in the record suggests that the officer who put Mr. Easley in handcuffs—Officer Baker—was aware of the putative open container violation at all.

### 2. Even if the Government Had Reasonable Articulable Suspicion, the Search Was Overly Intrusive

12

Even if the officers had stopped Mr. Easley based on reasonable articulable suspicion, which they did not, the search they undertook was performed in a manner that was not reasonably related to the scope of the situation at hand. Here, it was simply unreasonable to detain Mr. Easley and search him—twice—on the basis that the police officer suspected him of violation of Ohio's open container law.

First, Ohio's open container law is a minor misdemeanor. It is not an arrestable offense, and under typical circumstances it results in a citation—not in multiple intrusive pat-downs and an arrest. Although the Ohio Constitution may afford greater Fourth Amendment protections to criminal defendants than does the United States Constitution, it does not escape this Court's notice that Ohio Courts have emphatically rejected the use of the open container statute as a predicate violation for a custodial arrest or search incident to arrest. *State v. Riggins*, 2004-Ohio-4247, ¶ 10, 2004 WL 1800714 (Ohio Ct. App. 2004) (citing *State v. Brown*, 99 Ohio St.3d 323, 2003–Ohio–3931, 792 N.E.2d (Ohio 2003)). The rationale underlying these decisions is sound: to permit the state to intrude upon the sanctity of one's person and one's property based on suspicion of a minor misdemeanor is not only objectively unreasonable, it also invites selective enforcement. It is difficult for this Court to imagine, for example, police at a college football tailgate making a practice of detaining and frisking open container violators. And, as Justice Sotomayor observed in her dissent in *Utah v. Strieff*, "it is no secret that people of color are disproportionate victims of this type of scrutiny. *See* M. Alexander, THE NEW JIM CROW 95–136 (2010). For generations, black and brown parents have given their children 'the talk'— instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them. *See, e.g.*, W.E.B. Du Bois, THE SOULS OF BLACK FOLK (1903); J. Baldwin, THE

13

FIRE NEXT TIME (1963); T. Coates, BETWEEN THE WORLD AND ME (2015)." *Utah v. Strieff*, 136 S. Ct. 2056, 2070–71 (2016) (Sotomayor, J., Dissenting).

Moreover, *Terry* was never intended to permit law enforcement to subject citizens to the indignity of a full-body frisk based on suspicion that they violated any law, no matter how minor. In *Adams v. Williams*, the Supreme Court clarified that the purpose of the "limited search" it articulated in *Terry* "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Adams v. Williams*, 407 U.S. 143, 146 (1972). In other words, the "issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Bohannon*, 225 F.3d 615, 617 (6th Cir. 2000) (quoting *Terry*, 392 U.S. at 27). "[T]he Fourth Amendment does not tolerate, nor has the Supreme Court or this Court ever condoned, pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that the person detained was armed and dangerous." *United States v. Noble*, 762 F.3d 509, 525 (6th Cir. 2014) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 841 (6th Cir.2005))/

Nothing in the record suggests that any of the officers ever feared, let alone *reasonably* feared, that Mr. Easley or Mr. Sawyer were armed and dangerous—or even that they were remotely disruptive—in any way. (Hr'g Trans.[3]). And even if they had, the first frisk should

---

[3] The transcript provides, in relevant part:

> Q: They got their hands at their sides, correct?
>
> A: Yes, ma'am.
>
> Q: They're not drinking, right?
>
> A: No, ma'am. I don't see them drinking.
>
> Q: They're not being loud or yelling, right?

have been sufficient to ameliorate any fears they may have had. At the point at which they determined—albeit ultimately incorrectly—that Mr. Easley was unarmed, officers were required to release him. Any evidence obtained from the second search is derivative of the multiple unlawful steps law enforcement took leading up to the second search, starting with the initiation of the encounter, leading to the detention of Mr. Easley and the first inarguably warrantless frisk, and culminating in the failure to release him before the second search, which was itself arguably warrantless and unlawful. The evidence police officers obtained as a result of these illegalities—including the gun and any statements Mr. Easley made—must be suppressed under the

---

A: No, ma'am.

...

Q: Let me just back up a minute. So when you ask those gentlemen for their ID they gave it to you, right? They complied?

A: They did.

Q: They didn't give you any back talk?

A: No, ma'am.

Q: They didn't curse and yell at you, they didn't shake their fist?

A: No.

Q: Nobody told you they had a gun?

A: No, ma'am.

Q: At this point, you didn't have any indication that anybody was armed or dangerous, correct?

A: Nope.

15

exclusionary rule as the tainted "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

### III. CONCLUSION

The judiciary is the sole hedge against the "terrible risk" that *Terry* poses: that police will offer ex post facto rationales for investigating citizens in a manner that violates rights guaranteed to them by the United States Constitution. The Court must act to mitigate that risk. The motion to suppress (ECF No. 28) is therefore **GRANTED**. Both the firearm and Mr. Easley's post-arrest statements are hereby **SUPPRESSED**.

On the basis of this Court's preliminary oral ruling on this matter, the Government filed a Motion to Continue and Exclude Time from Speedy Trial Calculation. (ECF No. 36). The Court **GRANTS** a continuance until May 4, 2018, a period that will give the government "reasonable time necessary for effective preparation" under 18 U.S.C. § 3161(h)(7)(B)(iv). The period between the date of this order, April 18, 2018, and May 4, 2018, is consequently hereby **EXCLUDED** from the speedy trial clock.

**IT IS SO ORDERED.**

s/Algenon L. Marbley
ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE

**DATED: April 18, 2018**